**Case No.: 14-1346**

_____

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

**THOMAS P. GORMAN**

*Trustee-Appellant*

v.

**ROBERT A. WOLF**

*Debtor-Appellee*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

_____

**BRIEF OF THE APPELLANT, THOMAS P. GORMAN**

_____

Eva Choi
VSB# 81974
OFFICE OF THE CHAPTER 13 TRUSTEE
300 N. Washington Street, Suite 400
Alexandria, VA 22314
Phone: (703) 837-9282
Fax: (703) 836-8120
E-mail: echoi@chapter13alexva.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  14-1346          Caption:  Gorman v. Wolf

Pursuant to FRAP 26.1 and Local Rule 26.1,

Thomas P. Gorman
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                               ☐ YES ☑ NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☑YES ☐NO
     If yes, identify any trustee and the members of any creditors' committee:

     Trustee: Thomas P. Gorman (Appellant)
     300 N. Washington Street, Ste. 400
     Alexandria, VA 22314

     Creditors' committee: N/A

Signature: /s/ Eva Choi_____    Date: _____5/23/14_____

Counsel for: Appellant_____

## CERTIFICATE OF SERVICE
**************************
I certify that on ____May 23, 2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert R. Weed, Esq.
Counsel for Appellee
Law Offices of Robert Weed
45575 Shepard Drive, #201
Sterling, Virginia 20164

/s/ Eva Choi_____                    _____5/23/14_____
        (signature)                                          (date)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................... v

STATEMENT REGARDING ORAL ARGUMENT ............................... 1

JURISDICTION.................................................................................... 1

ISSUES PRESENTED........................................................................... 2

STANDARD OF REVIEW .................................................................... 2

STATEMENT OF THE CASE................................................................ 3

SUMMARY OF THE ARGUMENT ..................................................... 8

ARGUMENT ....................................................................................... 11

    I.   The Bankruptcy Court Failed To Properly Evaluate The Propriety of Debtor's Unnecessary Vehicle Purchase And Erred In Finding That The Corresponding Vehicle Loan Incurred In Contemplation Of Bankruptcy Is Not Abusive As A Matter Of Law, Since The Secured Debt Cannot Be Discharged 11

    II.   The Bankruptcy Court Clearly Erred In Finding That Debtor's Plan Was Proposed In Good Faith....................................................................... 18

        A.   The Bankruptcy Court Did Not Meaningfully Evaluate The Totality of Debtor's Chapter 13 Plan And Clearly Erred In Accepting Debtor's Candor In Lieu Of Actual Good Faith .............................................................. 19

B.    The Bankruptcy Court Failed To Scrutinize Debtor's Prepetition

Purchase of A Brand New Vehicle To The Detriment of His Creditors ..........23

III.    The Bankruptcy Court Improperly Took Judicial Notice That Debtor

Would Only Be Able To Obtain An "Exorbitant" Interest Rate On A Vehicle

Loan During His Bankruptcy ................................................................................28

CONCLUSION ....................................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................................32

CERTIFICATE OF SERVICE ................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Deans v. O'Donnell*, 692 F.2d 968 (4th Cir. 1982) ........................................... 19, 20

*In re Kirkland*, 600 F.3d 310 (4th Cir. 2010) .............................................................2

*In re McGovern*, 297 B.R. 650 (S.D. Fla. 2003) ............................................... 20, 21

*In re Wick*, 421 B.R. 206 (Bankr. D. Md. 2010) ...................................... 19, 20, 22

*In re Williams*, 475 B.R. 489 (Bankr. E.D. Va. 2012) ......................... 19, 24, 25, 26

*IRS v. White (In re White)*, 487 F.3d 199 (4th Cir. 2007) ..........................................2

*Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230 (11th Cir. 1999) ......................29

*Milavetz v. United States*, 559 U.S. 229 (2010) .................... 9, 11, 12, 13, 14, 15, 26

*Neufeld v. Freeman*, 794 F.2d 149 (4th Cir. 1986) ........................................... 19, 20

*Piaubert v. Sefrioui*, 208 F.3d 221 (8th Cir. 2000) ..................................................29

*Reed v. NDC Megamarts, Inc.*, 73 F.3d 364 (7th Cir. 1996) ...................................29

*Simpson v. United States*, 252 U.S. 547 (1920) .......................................................29

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) .......................................................25

*United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) ...........................2

## STATUTES

11 U.S.C. §523(a)(2) ......................................................................................... 11, 14

11 U.S.C. §526(a)(4) ...............................................................................................13

11 U.S.C. §1325 .......................................................................................................20

28 U.S.C. §157(b)(1)............................................................................1

28 U.S.C. §157(b)(2)(L) .....................................................................1

28 U.S.C. §158 .....................................................................................2

28 U.S.C. §158(a)(1)............................................................................1

28 U.S.C. §158(d)(1)............................................................................2

28 U.S.C. §1291 ...................................................................................2

28 U.S.C. §1334(a) ..............................................................................1

### RULES

FED. R. EVID. 201(b)..........................................................................28

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument as to all issues relating to this appeal.

## JURISDICTION

This is an appeal from a final Unpublished Order of the district court (J.A. 117) affirming the Order Overruling Chapter 13 Trustee's Objection to Debtor's Plan ("Order Overruling Trustee's Objection") (J.A. 102) and Order Confirming Plan (J.A. 110) issued by the United States Bankruptcy Court for the Eastern District of Virginia. The bankruptcy court's Order Overruling Trustee's Objection was entered October 3, 2013 (J.A. 7, 109) and the Order Confirming Plan was entered October 7, 2013 (J.A. 7, 111), to which a Notice of Appeal to the district court was timely filed on October 10, 2013 (J.A. 7-8, 115-116). The district court affirmed the bankruptcy court's decision by an Unpublished Order entered March 24, 2014 (J.A. 3, 117-118). The Notice of Appeal to this Court was timely filed on April 1, 2014 (J.A. 3, 119-120).

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334(a) and 157(b)(1) to hear matters relating to confirmation of a Chapter 13 Plan, as confirmation of a Plan was a core proceeding under 28 U.S.C. §157(b)(2)(L). The district court subsequently had jurisdiction to hear the appeal pursuant to 28 U.S.C. §158(a)(1). This Court has jurisdiction over this appeal under 28 U.S.C.

§§ 158(d)(1) and 1291. This appeal is from the district court's final order or judgment affirming the bankruptcy court's Order Overruling Trustee's Objection and Order Confirming Plan, which are final orders or judgments within the meaning of 28 U.S.C. §158. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010).

## ISSUES PRESENTED

1.     Whether a debtor's incurrence of secured debt and/or non-dischargeable debt in anticipation of and on the eve of a Chapter 13 bankruptcy may be abusive, or not in good faith.

2.     Whether the bankruptcy court erred in finding that the Debtor's Chapter 13 Plan was proposed in good faith when the Debtor knowingly lowered his disposable income available to repay creditors by purchasing a brand new vehicle on the eve of bankruptcy that he did not need.

## STANDARD OF REVIEW

Upon appellate review of a decision issued by the district court in its capacity as a bankruptcy appellate court, factual findings of the bankruptcy court are reviewed for clear error and legal conclusions are reviewed *de novo. In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010) (citing *IRS v. White (In re White)*, 487 F.3d 199, 204 (4th Cir. 2007)).

2

## STATEMENT OF THE CASE

Appellee ("Debtor") filed a Chapter 13 petition on July 9, 2013 (J.A. 5). Debtor admits that in anticipation of filing his Chapter 13 petition and after consulting with his counsel, he traded in a mechanically sound 2005 Ford Mustang—which Debtor owned free and clear of any liens—toward financing a brand new 2013 Ford Focus along with optional service and maintenance contracts (J.A. 33, 57, 79-80, 87-88). This resulted in a new expense of $419.39 per month which Debtor seeks to deduct from his Chapter 13 Plan payments (J.A. 37-44, 46, 52, 57). Debtor acknowledges at the time he purchased the 2013 Focus, he was aware that the consequence of incurring a monthly vehicle payment obligation would result in a corresponding reduction of payments to his unsecured creditors (J.A. 88). Shortly before the new vehicle purchase, Debtor also sold a 2009 Harley Davidson motorcycle that had equity (J.A. 33, 86).

Debtor is an above-median income earner who is single with no dependents (J.A. 26, 31, 37-44). Debtor's only secured creditor is the Ford Motor Credit claim arising from the 2013 Ford Focus purchased in contemplation of bankruptcy (J.A. 20). Ford Motor Credit's filed Proof of Claim does not assert any arrearage claim since the first payment on the vehicle installment contract in the amount of $419.39 did not even become due until after Debtor filed his Chapter 13 petition (J.A. 54-58). Accordingly, the sole objective of Debtor's Chapter 13 case is to

3

ultimately obtain a discharge of his unsecured debt totaling $45,514.35—all of

which are in the nature of consumer credit card debt and personal loans (J.A. 22-

23, 45-53).

Debtor's Chapter 13 Plan proposes payments of only $100.00 per month

for 18 months, then $550.00 per month for 42 months (upon repayment of a 401(k)

loan), for a total Plan funding of $24,900.00, and a 40% distribution to unsecured

creditors (J.A. 45-53). But for Debtor's eve-of-bankruptcy vehicle purchase, his

Plan payments would have been no less than $519.39 per month for 18 months,

then $1,069.39 per month for 42 months, for a total Plan funding of $54,263.40—

which funding would be more than enough to repay unsecured creditors at 100%[1]

(J.A. 22-23, 27, 46, 52).

Appellant-Trustee ("Trustee") filed an Objection to Confirmation to

Debtor's proposed Plan on the grounds that the Plan was not proposed in good

faith due to Debtor's prepetition positioning of his assets and debts to the detriment

of his creditors, and that the proposed Plan payments do not represent all of

Debtor's monthly disposable income (J.A. 64-66). Trustee argued that the Plan

---

[1] Debtor's Form B22C (hereinafter "means test") shows a monthly disposable income of negative $10.51 (J.A. 37-44). But for Debtor's eve-of-bankruptcy purchase of the 2013 Focus, Debtor's Form B22C would show a monthly disposable income of $506.49, and his projected monthly disposable income stated on his Schedule J would be $583.25 (J.A. 26-27, 37-44, 51-52). Thus, if Debtor had not financed a new vehicle in anticipation of bankruptcy, Debtor's disposable income stated on either his means test or Schedule J would *require* him to repay his unsecured creditors at 100%.

4

was not proposed in good faith since Debtor transformed the equity he had in two vehicles into financing a brand new 2013 Ford Focus on the eve of bankruptcy, knowing that the purchase would prejudice his creditors by reducing his monthly disposable income available for Plan payments (J.A. 64, 72-73, 87-88).

In Trustee's Objection, Trustee questioned whether Debtor actually incurs some of the budget expenses Debtor claims on his Schedule J such as transportation-related expenses (J.A. 52, 64). Debtor's budgeted transportation-related expenses total $438.92, and are also in excess of the Internal Revenue Service ("IRS") standard transportation allowance of $277.00 per month for the D.C. metro area that is the allowable expense deduction used on the means test (J.A. 52, 62-63, 64). Debtor's claimed transportation expenses appear especially excessive in light of the fact that at the time Debtor financed his brand new 2013 Focus, he also purchased and financed a vehicle Service Contract for $3,100.00 and a separate vehicle Maintenance Agreement for another $3,000.00 (J.A. 57). Because the cost of the Service Contract and Maintenance Agreement were also financed as part of the vehicle financing, unsecured creditors are also being asked to pay for these optional service and maintenance agreements (J.A. 27, 46, 52, 57).

On September 26, 2013, the bankruptcy court held a hearing on Trustee's Objection to Confirmation of Debtor's proposed Plan (J.A. 7, 67-101). The only

evidence Debtor presented to the court in addressing the issues raised in Trustee's Objection was testimony from Debtor himself (J.A. 67-101).

Debtor candidly admitted that he and his counsel discussed "ways [Debtor] could increase the ability of getting a car before filing bankruptcy . . ." and that Debtor was aware that his could lower his monthly Plan payment if he had a vehicle payment obligation (J.A. 87-88). Debtor testified that he was not experiencing any maintenance issues with the 2005 Mustang, and Debtor further acknowledged that the trade-in value of $6,500.00 he received for the 2005 Mustang was below market value and that he could have sold the 2005 Mustang in excess of $6,500.00 (J.A. 84-85). Debtor also agreed that his personal property taxes on the 2013 Focus will certainly be higher than what it was on the 2005 Mustang, and that his estimated monthly savings on gas for the 2013 Focus compared to the 2005 Mustang did not offset his new monthly vehicle payment of $419.39 (J.A. 85-86). The justification Debtor gave for purchasing a brand new vehicle immediately before filing for bankruptcy was the *fear* of unfavorable interest rates on any vehicle loan Debtor may need to obtain after filing for bankruptcy and potential future repair and maintenance expenses that *might* be needed on the 2005 Mustang (J.A. 77).

Assuming *arguendo* that Debtor might have required a replacement vehicle at some point in the future, Debtor did not present any evidence to support that the

interest rate he would have received on any post-petition loan would be sufficiently more unfavorable than the 9.45% interest rate he received when financing the 2013 Focus to justify replacing a mechanically sound vehicle immediately before filing for bankruptcy (J.A. 54-58, 70-100). Additionally, at no point did Debtor present any evidence or even offer any explanation why it was reasonable or necessary for him to purchase a brand new vehicle rather than a used vehicle, again assuming a replacement vehicle was even necessary (J.A. 70-100).

Nonetheless, the bankruptcy court overruled Trustee's Objection to Confirmation and confirmed Debtor's proposed Plan (J.A. 102-114). In finding that Debtor's Plan was proposed in good faith, the bankruptcy court found: (1) that Debtor "was not motivated by a desire to load up on debt in anticipation of his bankruptcy filing"; (2) that Debtor's conduct of incurring debt by purchasing the 2013 Focus in contemplation of bankruptcy is not abusive since the secured debt cannot be discharged; and (3) that Debtor's purchase of the 2013 Focus on the eve of bankruptcy was not abusive because Debtor did not purchase a "luxury" vehicle (J.A. 103, 107-108). Additionally, the bankruptcy court agreed with Debtor that the purchase of the 2013 Focus in contemplation of bankruptcy was "prudent planning" since: (1) the 2013 Focus is more fuel efficient and less costly to insure; (2) that "[i]t was predictable that the Debtor's Mustang would be in need of repairs during the five year life of the Debtor's bankruptcy case, [and] at the conclusion of

7

which the Mustang would have been twelve years old"; and (3) because Debtor "testified that if he were to file for bankruptcy and needed to purchase a vehicle during the course of his case, the interest rate for a new car loan would be exorbitant" (J.A. 104, 108).

In the Order Overruling Chapter 13 Trustee's Objection to Debtor's Plan, the bankruptcy court failed to address or make findings regarding the other good faith and disposable income issues raised in Trustee's Objection to Confirmation (J.A. 102-109). Upon appeal, the district court affirmed the bankruptcy court's decision (J.A. 117-118).

## SUMMARY OF THE ARGUMENT

Trustee-Appellant argues that the bankruptcy court below clearly erred in finding that Debtor proposed his Plan in good faith despite Debtor's prepetition conduct of intentionally encumbering his income in a manner that minimizes his disposable income available for payments to his unsecured creditors under his Chapter 13 Plan. Debtor traded in an unencumbered and mechanically sound vehicle for less than market value toward financing a brand new vehicle (along with optional service and maintenance agreements) in contemplation of filing for bankruptcy, and Debtor did so knowing that incurring a vehicle payment obligation would prejudice his creditors.

8

The basic premise from which the bankruptcy court evaluated Debtor's eve-of-bankruptcy vehicle purchase was erroneous. Specifically, the court's notion that loading up on secured debt in contemplation of bankruptcy cannot be abusive since such secured debt cannot be discharged pursuant to 11 U.S.C. §523(a)(2), is a misinterpretation of the opinion issued by the Supreme Court of the United States in *Milavetz v. United States*, 559 U.S. 229 (2010). The bankruptcy court interpreted the Supreme Court's holding that loading up on unsecured debt in anticipation of bankruptcy is abusive *per se*, to also equate to a ruling *sub silento* that the inverse is true: if the type of debt incurred on the eve of bankruptcy is not unsecured debt, then such conduct is not abusive.

Additionally, the bankruptcy court erred in its findings when it improperly took judicial notice that Debtor would only be able to obtain an "exorbitant" interest rate on a vehicle loan during his bankruptcy without taking *any* evidence from the Debtor as to what this interest rate might be. On the contrary, Chapter 13 debtors who sought approval from the bankruptcy court to incur new vehicle loans in the 2013 calendar year were able to obtain vehicle loans with interest rates as low as 2.99%, which cannot be described as an "exorbitant" interest rate by any measure.

As a result, the bankruptcy court failed to properly scrutinize the propriety of Debtor's vehicle purchase and the consequent effect of incurring the corresponding

secured debt that directly harms his unsecured creditors who *will* be discharged. In its findings, the bankruptcy court distinguished Debtor's conduct from abusive conduct primarily based on the fact that Debtor did not purchase a "luxury" vehicle (without addressing whether the two optional service and maintenance agreements might be "luxurious"). The court disregarded the pertinent fact that Debtor did not then need the vehicle he purchased in contemplation of his impending bankruptcy that his prepetition creditors are literally being asked to pay for during the life of the Chapter 13 Plan since Debtor's car payments are being made dollar for dollar at their expense.

That is not to say that all vehicle purchases on the eve of bankruptcy are abusive. Rather, a proper evaluation of whether a debtor's prepetition vehicle purchase is abusive should be more akin to a balancing test that looks to: whether there was a legitimate necessity for obtaining reliable transportation; whether the vehicle purchase enhances a debtor's financial prospects and improves his ability to perform under a Chapter 13 Plan; whether such transportation was acquired at a reasonable cost; and whether the debtor made efforts to minimize such costs.

Chapter 13 debtors undoubtedly need reliable transportation in order to generate the income that is used to repay their creditors. But nothing in the Bankruptcy Code or its underlying policies mandate or entitle a debtor to own a new car, nor do the same policies allow a debtor to abandon a mechanically sound

10

vehicle at the mere thought of potential maintenance or repair costs and purchase a brand new vehicle at the expense of his creditors.

**ARGUMENT**

**I.     The Bankruptcy Court Failed To Properly Evaluate The Propriety of Debtor's Unnecessary Vehicle Purchase And Erred In Finding That The Corresponding Vehicle Loan Incurred In Contemplation Of Bankruptcy Is Not Abusive As A Matter Of Law, Since The Secured Debt Cannot Be Discharged**

The bankruptcy court failed to properly evaluate Debtor's eve-of-bankruptcy vehicle purchase as the court below erroneously concluded that as a matter of law, loading up on secured debt in anticipation of bankruptcy cannot be abusive since such secured debt cannot be discharged pursuant to 11 U.S.C. §523(a)(2).  The bankruptcy court misinterpreted the opinion issued by the Supreme Court of the United States in *Milavetz v. United States*, 559 U.S. 229 (2010), holding that the practice of loading up on unsecured debt in anticipation of bankruptcy is abusive *per se*, to also equate to a ruling *sub silento* that the inverse is true: if the type of debt incurred on the eve-of-bankruptcy is not unsecured debt, then such conduct is not abusive.

As such, the bankruptcy court failed to properly scrutinize the propriety of the vehicle purchase and the consequent effect of Debtor's incurrence of a secured debt on the eve of bankruptcy that directly harms his unsecured creditors who will

be discharged. The bankruptcy court disregarded the fact that Debtor did not need a brand new vehicle, and that Debtor admitted he was not experiencing *any* major maintenance issues with the 2005 Mustang. The bankruptcy court failed to balance the interest of creditors as it did not examine whether Debtor could have obtained a reliable vehicle at a lower cost or whether Debtor's purchase of the optional vehicle Service Contract and Maintenance Agreement were reasonable or necessary or just an attempt by Debtor to further load up on secured debt as Debtor was heavily incentivized to do so since his creditors would be paying for these extravagant warranties. The bankruptcy court likewise erred when it failed to examine if the vehicle purchase enhanced Debtor's financial prospects or improved his ability to perform under his Chapter 13 Plan, which it clearly did not since Debtor already had a reliable vehicle to get to and from work, the only difference now being he gets to commute in a newer, nicer vehicle.

The unnecessary purchase of a brand new vehicle in anticipation of an impending Chapter 13 filing and under the guise of prudent financial planning, is not a valid purpose for incurring additional debt on the eve of bankruptcy when there is no corresponding benefit to creditors in the form of a debtor's enhanced financial prospects and ability to perform under a Chapter 13 Plan. *Milavetz v. United States*, 559 U.S. 229, 243-48 (2010).

The plaintiffs in *Milavetz* initiated a pre-enforcement action against the United States and sought a declatory judgment pertaining to certain provisions of the Bankruptcy Code enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *Milavetz*, 559 U.S. at 234. Amongst other provisions, the plaintiffs sought a declatory judgment holding that 11 U.S.C. §526(a)(4) did not apply to attorneys and alternatively argued that the provision was unconstitutional as it prohibited attorneys from advising their clients to incur *any* additional debt in contemplation of bankruptcy. *Milavetz*, 559 U.S. at 229-31.

The Supreme Court examined the language of 11 U.S.C. §526(a)(4) which prohibits a debt relief agency from advising an assisted person to incur more debt in contemplation of filing for bankruptcy, and concluded that the phrase "in contemplation of" in the context of §526(a)(4) "refers to a specific type of misconduct designed to manipulate the protections of the bankruptcy system," and that §526(a)(4) only bars advising a debtor to incur more debt due to a debtor's impending bankruptcy filing, rather than incurring debt for a valid purpose. *Id.* at 243. Thus, the Supreme Court determined that the controlling question under §526(a)(4) is whether the impelling reason for advising a debtor to incur more debt on the eve of bankruptcy "was the prospect of filing for bankruptcy." *Id.* The Court proceeded to discuss the type of conduct that §526(a)(4) prohibits "will

*generally consist* of advice to "load up" on debt with the expectation of obtaining

its discharge–*i.e.*, conduct that is abusive *per se*." *Id.* at 244 (emphasis added).

Importantly, the Court recognized that while BAPCPA implemented

statutory provisions such as 11 U.S.C. §526(a)(4) in order to curb the perceived

abuses of the bankruptcy process such as the practice of loading up on debt on the

eve of bankruptcy, BAPCPA also inadvertently increased the risk of that same

abuse. *Id.*  Specifically, BAPCPA established the "means test" which is a

mechanism for objectively evaluating a debtor's ability to repay his creditors. *Id.*

However, the means test "also enhances incentives to incur additional debt prior to

filing, as payments on secured debts offset a debtor's monthly income under the

formula." *Id.*  Accordingly, other provisions enacted in BAPCPA deals with such

practices by expanding the exceptions to discharge under 11 U.S.C. §523(a)(2). *Id.*

The Supreme Court concluded that §526(a)(4) is meant to prohibit debt that

is manipulatively incurred, which would consequently prejudice creditors resulting

from the debtor's discharge of such debts and dilution of the bankruptcy estate. *Id.*

at 245.  On the other hand, prudent advice to a debtor to incur debt would not be

prohibited under §526(a)(4) as such advice would either benefit both debtors and

creditors, or "at the very least should cause no harm." *Id.*  Thus, §526(a)(4) does

not prohibit advising a debtor to incur more debt on the eve of bankruptcy when

doing so would increase a debtor's ability to repay his creditors, "as the promise of

enhanced financial prospects, rather than the anticipated filing, is the impelling cause" for such advice. *Id.* at 248 n.6.

In the present case, Debtor openly admitted that after consulting with his bankruptcy counsel and discussing "ways [Debtor] could increase [his] ability of getting a car before filing bankruptcy," Debtor traded in his unencumbered 2005 Ford Mustang toward financing a brand new 2013 Ford Focus, along with an expensive optional vehicle Service Contract and additional vehicle Maintenance Agreement.  Significantly, Debtor traded in his 2005 Mustang even though he was not experiencing any major maintenance issues with the vehicle, and he did so knowing that incurring a monthly secured payment obligation would lower the monthly disposable income he would have available to repay his credit card and consumer debts as his counsel advised him of such.  Thus, all the evidence in the record—including Debtor's own testimony—shows that the *primary* reason Debtor financed a brand new vehicle he did not need was due to his impending Chapter 13 bankruptcy, and not for any other legitimate purpose.

Debtor's eve-of-bankruptcy purchase of the 2013 Focus is unlike the permissible situations the Supreme Court discussed where incurring additional debt for a valid purpose would not constitute an abuse of the bankruptcy process.  An example of a permissible situation would be a hypothetical debtor who does not already have a reliable means of transportation and incurs debt on the eve of

15

bankruptcy in order to obtain a more favorable interest rate to purchase a reliable vehicle that is necessary for him to generate the income needed to repay his creditors: this type of conduct is motivated by what the Supreme Court described as "the promise of enhanced financial prospects" instead of the anticipated bankruptcy, and would likely benefit both the hypothetical debtor and his creditors as the debtor has now improved his ability to perform under a Chapter 13 Plan and repay his creditors by obtaining the reliable transportation needed to generate income.

In the present case, Debtor already had a reliable vehicle necessary for him to commute to work and generate income since his 2005 Mustang did not need to be replaced as it was not exhibiting any major maintenance issues. Instead, Debtor chose to trade in the 2005 Mustang that he owned free and clear of any liens to finance a brand new 2013 Focus in anticipation of bankruptcy, which vehicle installment payments did not even commence until after Debtor's bankruptcy was filed. Additionally, Debtor's ability to perform under his Chapter 13 Plan has been adversely affected by his purchase of the 2013 Focus. Although the 2013 Focus may be more fuel efficient, and less expensive to insure, Debtor now has a monthly vehicle payment of $419.39 where he did not have one before for the 2005 Mustang, increased personal property tax liability due to the higher assessment value of the brand new 2013 Focus, and his claimed transportation

expenses are still in excess of the IRS standard allowance for the Northern Virginia area despite having purchased a vehicle Service Contract and a separate Maintenance Agreement.

Hence, the new and additional expenses relating to the 2013 Focus significantly outweigh any purported savings Debtor claims to have achieved by trading in his 2005 Mustang.  In the end, there remains no articulable benefit to creditors or to Debtor's ability to repay his creditors resulting from his vehicle purchase, and Debtor remains the only party reaping the rewards of his conduct. Instead of Debtor's otherwise disposable income being used to pay his creditors, the lion's share of that disposable income will now be used to pay for his new car.

Finally, the impetus for Debtor to load up on secured debt in anticipation of bankruptcy is particularly high in this case.  Aside from the secured claim against Debtor's new vehicle, the entirety of the debts in this Chapter 13 case consist of unsecured credit card and consumer debt.  Debtor's Chapter 13 Plan does not cure any mortgage arrearages in order to save a home as Debtor does not own any real property, nor does the Plan pay any overdue tax liabilities since Debtor has none. The only purpose of Debtor's Chapter 13 Plan is to repay his unsecured creditors over the course of his five year Plan, at the end of which the remaining balance of his unsecured debt will be discharged.  Debtor could have kept the unencumbered 2005 Mustang and would have been required to repay his unsecured creditors at

17

least $25,163.40 more over the course of his five year Plan, which would have been sufficient to repay his creditors in full.  Instead, Debtor financed a brand new vehicle so that his monthly disposable income is such that he only needs to pay a nominal amount toward his unsecured debt over the course of his Plan, which will be discharged at the end of five years.

The bankruptcy court erred in findings as it failed to recognize that the circumstances surrounding Debtor's case strongly incentivized him to load up on additional debt on the eve of his bankruptcy, and the court likewise failed to recognize that Debtor's incurrence of *secured* debt is abusive conduct that is just as harmful to unsecured creditors as recognized by the Supreme Court of the United States and by Congress when it enacted BAPCPA.

## II.    The Bankruptcy Court Clearly Erred In Finding That Debtor's Plan Was Proposed In Good Faith

Debtor's prepetition conduct of loading up on additional debt in contemplation of bankruptcy that unilaterally benefits himself to the detriment of his creditors was meant to give him a head start over his creditors rather than a fresh start, and the bankruptcy court below erred in endorsing Debtor's prepetition manipulation of the bankruptcy process.

When a debtor attempts to get a head start over his creditors by incurring secured debt on the eve of bankruptcy from the purchase of a new vehicle that is

18

not necessary to his financial reorganization, and knowing that doing so would avoid repayment to creditors, that is an abuse of the provisions, purpose and spirit of Chapter 13. *See In re Wick*, 421 B.R. 206, 214-15 (Bankr. D. Md. 2010) ) (citing *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982); *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir. 1986)).  Thus, a Chapter 13 Plan that embodies an improvident eve-of-bankruptcy vehicle purchased at the expense of creditors cannot have been proposed in good faith and cannot be confirmed. *In re Williams*, 475 B.R. 489, 492-95 (Bankr. E.D. Va. 2012).

### A.    The Bankruptcy Court Did Not Meaningfully Evaluate The Totality of Debtor's Chapter 13 Plan And Clearly Erred In Accepting Debtor's Candor In Lieu Of Actual Good Faith

The bankruptcy court below clearly erred in confirming Debtor's proposed Plan as the court failed to evaluate the totality of circumstances surrounding Debtor's Chapter 13 case because the court: failed to properly scrutinize the propriety of Debtor's eve-of-bankruptcy purchase of the 2013 Focus; failed to examine Debtor's intent in purchasing such vehicle; declined to analyze the harm caused by Debtor's vehicle purchase to his creditors; and declined to evaluate the nature of the debts in this case and the circumstances surrounding Debtor's bankruptcy.  It appears that the bankruptcy court accepted Debtor's candor in his testimony at the September 26, 2013 confirmation hearing in lieu of meaningfully

evaluating whether Debtor's proposed Plan meets the requirements under
11 U.S.C. §1325.

When examining the totality of circumstances of a particular Chapter 13
Plan and in determining whether the Plan has been proposed in good faith, a court
is required to evaluate several factors including, but not limited to: the proposed
percentage of repayment under the Plan, a debtor's financial situation, the period
of time over which payment will be made, a debtor's employment history and
prospects, the nature an amount of unsecured claims, any past bankruptcy filings, a
debtor's honesty in representing the facts of his case, any unusual or exceptional
problems a debtor may be burdened with, and a debtor's prepetition conduct. *In re
Wick*, 421 B.R. 206, 214-15 (Bankr. D. Md. 2010) (citing *Deans*, 692 F.2d at 972;
*Neufeld*, 794 F.2d at 153).  If in examining the above factors indicate a debtor's
intent to achieve Chapter 7-like debt relief through debt avoidance, rather than
financial rehabilitation through debt repayment which is the purpose of Chapter 13,
then a debtor lacks the necessary good faith for obtaining the protections and relief
provided under Chapter 13 bankruptcy. *In re McGovern*, 297 B.R. 650, 658-59
(S.D. Fla. 2003).

Although the bankruptcy court in *McGovern* was troubled by the debtor's
prepetition lease of a luxury vehicle and the debtor's failure to include or disclose a
$10,000.00 employment bonus he received on his Statement of Financial Affairs,

20

the court was persuaded by the debtor's candid dealings with the court and found that his Chapter 13 Plan was proposed in good faith. *McGovern*, 297 B.R. at 559-60.

On appeal, the district court held that the bankruptcy court below clearly erred in finding good faith based solely on the debtor's honesty in his dealings with the court, and instead should have evaluated whether the debtor was genuinely intent on repaying his debts, the largest of which was a judgment award that was not dischargeable in a Chapter 7 proceeding. *Id.* The district court recognized that to some degree, all debtors are motivated by obtaining a fresh start in seeking bankruptcy protection. *Id.* However, the court provided that the "central and more pertinent inquiry" of a debtor's motivations in seeking bankruptcy protection under Chapter 13 is "with an intent that is consistent with the spirit and purpose of that law—rehabilitation through debt repayment," which requires a bankruptcy court to evaluate a debtor's prepetition conduct in order to properly come to a conclusion. *Id.* at 660-61. The district court concluded that the bankruptcy court clearly erred when it failed to adequately examine the debtor's motivation in seeking bankruptcy relief under Chapter 13, and that the record strongly supported a showing that the debtor's intent was to obtain debt avoidance, not debt repayment, and contrary to the spirit and purpose of Chapter 13 bankruptcy. *Id.* at 661.

By contrast, the bankruptcy court in *Wick* examined the totality of the circumstances surrounding the debtor's proposed Plan as well as her prepetition conduct and found that the facts of that case did not support a finding that the debtor's Plan was not proposed in good faith. *Wick*, 421 B.R. at 215. In coming to its conclusion, the bankruptcy court noted that there was a confluence of events outside of the debtor's control which culminated into her need for bankruptcy, began approximately two years prior to her bankruptcy petition and included her husband's dramatic loss of income. *Id.* at 208-15.

In the present case, similar to the bankruptcy court in *McGovern*, the bankruptcy court below failed to adequately evaluate Debtor's motivations for seeking Chapter 13 protection and the totality of the circumstances surrounding Debtor's case, but was instead persuaded by Debtor's candor in finding that his Plan was proposed in good faith. Unlike the circumstances surrounding the debtor in *Wick*, the bankruptcy court failed to recognize that the nature and amount of the unsecured debts in this case arose entirely from excessive consumer spending. Also like the debtor in *McGovern*, Debtor in this case likely would not be able to obtain debt relief through debt avoidance in a Chapter 7 proceeding. Whereas the debtor in *McGovern* sought relief from a debt that was non-dischargeable in a Chapter 7 proceeding, the unsecured debts in the present case may be dischargeable in a Chapter 7 proceeding, however, Debtor likely would not be

eligible given that he is an above-median income earner and the nature of his unsecured debts are mostly, if not all, consumer debts.

The bankruptcy court below did not meaningfully examine the totality of the circumstances surrounding Debtor's bankruptcy as well as his proposed Chapter 13 Plan. Debtor is single with no dependents, and his income is well above the state median income level and has been stable and steadily increasing for the past three years. There are no unusual or exceptional events leading up to Debtor's bankruptcy that was outside of Debtor's control, such as a medical condition or loss of employment. Rather, Debtor's bankruptcy is the result of consumer spending in excess of his means, which is underscored by Debtor's purchase of a brand new vehicle on the eve of filing his petition.

Debtor's prepetition incurrence of debt is one of the hallmarks of abusive conduct designed to give him a head start over his creditors, and the circumstances and facts surrounding Debtor's Chapter 13 case and proposed Plan are indicative of Debtor's intent to avoid his debts, not repay his debts to the best of his ability.

## B. The Bankruptcy Court Failed To Scrutinize Debtor's Prepetition Purchase of A Brand New Vehicle To The Detriment of His Creditors

The bankruptcy court failed to scrutinize Debtor's unnecessary eve-of-bankruptcy purchase of the 2013 Focus and wholly disregarded the consequent direct harm to unsecured creditors in finding that Debtor's vehicle purchase was

not abusive based on the court's determination that Debtor did not purchase a "luxury" vehicle. However, a Chapter 13 Plan that does not "purge the taint of [an] improper car purchase on the eve of bankruptcy" cannot be confirmed as it is filed in bad faith. *In re Williams*, 475 B.R. 489, 493-94 (Bankr. E.D. Va. 2012).

The bankruptcy court in *Williams* denied confirmation of the debtors' proposed Plan as it failed to remedy the harm to creditors caused by debtors' eve-of-bankruptcy vehicle purchase. *Id.* at 493. Shortly before their bankruptcy, the debtors owned three vehicles: an unencumbered 1996 Buick Skylark, a 2007 Lexus RX 400H and a 2007 Lexus ES 350. *Id.* at 490-91. After retaining and consulting their bankruptcy counsel, the debtors in that case traded in two encumbered vehicles, a Lexus RX 400H and a Lexus ES 350, for a 2011 Lexus RX-350 six days before their Chapter 13 petition was filed. *Id.* at 491. The Lexus RX 400H required monthly payments of $484.00 with twelve payments remaining at the time of the transaction, and the Lexus ES 350 required monthly payments of $866.00 with twenty-four months remaining at the time of the transaction. *Id.* In purchasing the 2011 Lexus RX-350, the debtors incurred an additional $35,047.69 of secured debt on the vehicle, which required monthly payments of $565.28 amortized over 75 months—the debtors' rationale being that they lowered their monthly vehicle installment obligations from $1,350.00 per month for both the

24

Lexus ES 350 and Lexus RX 400H to $565.28 per month for the 2011 Lexus RX 350. *Id.*

Upon the trustee's objections to the initial Plans proposed in that case, the debtors' third proposed Plan in *Williams* sought to cure the prejudice to creditors resulting from their eve-of-bankruptcy vehicle purchase by substituting their new vehicle payment of $565.28 with $421.84, which the latter figure represents a hypothetical re-amortization of the debtors' two prior vehicle loans with interest calculated at the *Till* rate. *Id.* at 492 (citing *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

The bankruptcy court in *Williams* analyzed and compared the three options the debtors had with respect to their vehicles and evaluated each of those options in light of the corresponding harm to creditors. *Id.* 492. The first option the debtors had was to sell the Lexus ES 350, which had the higher monthly payment and longer remaining loan term, and keep the Buick Skylark and the Lexus RX 400H, which would leave the debtors with the twelve remaining payments on the Lexus RX 400H of $484.00 per month. *Id.* The debtors' second option would be to sell the Buick Skylark, keep the Lexus ES 350 and the Lexus RX 400H, and re-amortize the vehicle loans calculated at the *Till* rate, which would result in a combined vehicle payment of $421.84 per month. *Id.* Finally, the debtors' third option, which is what the debtors actually chose, would be to keep the Buick

25

Skylark and trade in their other two encumbered vehicles for a brand new vehicle

and incurring additional secured debt in the process. *Id.* The bankruptcy court

determined that had debtors elected the first option, they would be able to fund

their Chapter 13 Plan with an additional $24,207.00. *Id.* Had the debtors elected

the second option, they would be able to fund their Chapter 13 Plan with an

additional $8,606.00. *Id.*

The debtors' Chapter 13 Plan proposed to implement what the bankruptcy

court labeled as the debtors' second option in its analysis above. *Id.* However, the

bankruptcy court could not accept the debtors' Plan as the proposal embodied a

"no harm, no foul" rule. *Id.* at 493. The court stated that the debtors had the option

of doing what they were now proposing but instead chose to benefit themselves by

purchasing a new car while their creditors were ignorant of the risk of reduced

payments imposed upon them by the debtors' conduct. *Id.* In the end, the

bankruptcy court determined that the most appropriate remedy that should be

embodied in the debtors' Chapter 13 Plan would be to treat the vehicles as if the

improper purchase of the 2011 Lexus RX-350 had never occurred and as if the

debtors had instead surrendered the 2007 Lexus ES 350, as it was the vehicle

burdened with a higher monthly payment. *Id.* at 493-94.

The facts in the present case are very similar to those in *Williams*, and both

cases were decided post-*Milavetz* from the same bankruptcy court below. Similar

to the debtors in *Williams*, Debtor disposed of two vehicles with equity in them prior to filing his Chapter 13 case: a 2009 Harley Davidson motorcycle and a 2005 Ford Mustang.  Like in *Williams*, Debtor transformed the equity he had in both vehicles in some fashion and financed a brand new vehicle at the expense of his creditors on the eve of bankruptcy.

However, unlike in *Williams*, the bankruptcy court in the present case did not meaningfully evaluate the harm inflicted by Debtor's vehicle purchase on his unsecured creditors.  While the bankruptcy court's opinion acknowledges that but for the vehicle purchased in contemplation of bankruptcy, Debtor's Plan would at minimum be funded by an additional $25,163.40 and the dividend to unsecured creditors would double from 40% to 80%, the court does not perform any further analysis on this point and appears to accept the proposed 40% dividend as sufficient (although the basis for the court's conclusion is not specified).  Instead, the extent of the bankruptcy court's analysis in finding that Debtor's Plan was proposed in good faith consists of stating that the Plan proposed a 40% dividend to unsecured creditors, that Debtor does not have any past bankruptcy filings or non-dischargeable debts, and that Debtor had not been dishonest in his representations to the court.  The bankruptcy court clearly erred when it neglected to analyze first, whether Debtor reasonably needed to replace the 2005 Mustang, and if so, whether

it was reasonable for Debtor to have purchased a brand new vehicle with two optional service and maintenance contracts at the expense of his creditors.

In comparing the facts of the present case to the facts in *Williams*, the bankruptcy court acknowledged the significant similarities between the two cases, but distinguished Debtor's purchase of the 2013 Focus from the purchase of the 2011 Lexus in *Williams* based solely on the court's determination that Debtor in the present case did not purchase a "luxury" vehicle. What the bankruptcy court failed to recognize is that creditors are nonetheless harmed by abusive eve-of-bankruptcy vehicle purchases, regardless of whether such vehicle may be considered to be a "luxury" vehicle.

## III. The Bankruptcy Court Improperly Took Judicial Notice That Debtor Would Only Be Able To Obtain An "Exorbitant" Interest Rate On A Vehicle Loan During His Bankruptcy

The bankruptcy court erred when it found that Debtor's purchase of a new vehicle in contemplation of bankruptcy was "prudent planning" when the court improperly took judicial notice of Debtor's unfounded assertions that any interest rate Debtor might have obtained for a vehicle loan during the course of his Chapter 13 case would undoubtedly be "exorbitant." What Debtor's interest rates might have been is not a fact that the bankruptcy court may take judicial notice of.[2] A

---

[2] FED. R. EVID. 201(b). Kinds of Facts that May be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:

court may, for example, take judicial notice of what the prime interest rate was on a particular date as that information is readily available and easily accessible.[3]

On the contrary, what Debtor's interest rate on a vehicle loan might have been is not a fact that is readily discernible. Debtor's unsubstantiated assertions that he would *only* be able to obtain a new vehicle loan at an "exorbitant" interest rate during the life of his Chapter 13 Plan without providing even a scintilla of supporting evidence, and the bankruptcy court's judicial notice of the same is without any foundation in fact and reality.

Chapter 13 debtors regularly file Motions to Incur Debt during the course of their cases, seeking court approval to obtain new debt for the purposes of financing a replacement vehicle. Several such Motions to Incur Debt that were heard before the same bankruptcy court below in the 2013 calendar year, sought approval of vehicle loans with respective interest rates that could not be described by any measure as "exorbitant" — including a Motion to Incur Debt filed by

---

(1) is generally known within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned.

[3] *See e.g.*, *Simpson v. United States*, 252 U.S. 547 (1920); *Piaubert v. Sefrioui*, 208 F.3d 221 (8th Cir. 2000); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230 (11th Cir. 1999); *Reed v. NDC Megamarts, Inc.*, 73 F.3d 364 (7th Cir. 1996). Historical prime rates provided by the Federal Reserve Board may be found at: http://www.federalreserve.gov/releases/h15/data.htm.

Appellee-Debtor's counsel in another case that sought court approval to obtain a new vehicle loan with an interest rate of 2.99%.[4]

Thus, the bankruptcy court clearly erred in taking judicial notice that Debtor's interest rate on a vehicle loan that he *might* have needed to obtain would be "exorbitant" as that fact was never supported—let alone proven—by any empirical evidence, when the undeniable reality is that competitive, and sometimes even favorable, interest rates on vehicle loans are routinely offered to Chapter 13 debtors in this jurisdiction.

## CONCLUSION

Trustee respectfully asks this Court to reverse the bankruptcy court's decision and vacate the Order Confirming Debtor's Chapter 13 Plan. Without requiring Debtor to make any meaningful showing of why the purchase of a brand new vehicle on the eve of bankruptcy was legitimately necessary, let alone reasonable, the bankruptcy court's decision essentially endorses the abusive practice of loading up on secured debt in contemplation of a Chapter 13 bankruptcy as a means for debtors to procure a benefit onto themselves while

---

[4] *In re Chapman*, Case No. 09-13113-RGM: Debtor's Mot. to Approve Purchase and Financing 1, Dec. 6, 2012, ECF No. 27; Hearing held, motion granted, January 9, 2013, ECF No. 30. *See also In re Garbrah*, Case No. 10-17812-RGM: Debtor's Mot. For Authority to Incur/Modify, Oct. 11, 2013, ECF No. 55 (seeking approval of new vehicle loan with 4.99% interest rate); *In re Bearce*, Case No. 11-14785-BFK: Debtor's Mot. to Incur Debt, Aug. 8, 2013, ECF No. 28 (seeking approval of new vehicle loan with 5.79% interest rate).

avoiding repayment to their unsecured creditors.  Such a practice cannot have been

what Congress intended to be considered as acceptable conduct within the meaning

of good faith when it enacted the *Bankruptcy Abuse Prevention* and Consumer

Protection Act of 2005.

Dated: May 23, 2014                                    Respectfully Submitted,

                                                      _/s/ Eva Choi_____

                                                Eva Choi (VSB# 81974)
                                                Counsel for Appellant
                                          OFFICE OF THE CHAPTER 13 TRUSTEE
                                          300 N. Washington Street, Suite 400
                                                Alexandria, VA 22314
                                                Phone: (703) 837-9282
                                                Fax: (703) 836-8120
                                          E-mail: echoi@chapter13alexva.com

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 14-1346        **Caption:** Gorman v. Wolf

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains _____7,594_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word _____ [*identify word processing program*] in
   14-point Times New Roman _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Eva Choi _____

Attorney for Appellant _____

Dated: 5/23/14 _____

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of May, 2014, the foregoing Brief of the Appellant was served on all parties or their counsel of record through the CM/ECF system to authorized users, or if they are not, by serving a true and correct copy at the address listed below:

Robert R. Weed, Esq.
Counsel for Appellee
LAW OFFICES OF ROBERT WEED
45575 Shepard Drive, #201
Sterling, Virginia 20164
(1 copy, via Federal Express)

Patricia S. Conner, Clerk
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia, 23219-3517
(8 copies, via Federal Express)

_/s/ Eva Choi_____

Eva Choi (VSB# 81974)
Counsel for Appellant
OFFICE OF THE CHAPTER 13 TRUSTEE
300 N. Washington Street, Suite 400
Alexandria, VA 22314
Phone: (703) 837-9282
Fax: (703) 836-8120
E-mail: echoi@chapter13alexva.com

33